IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DALE R. PETERS, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| LOUIS S. FOLINO, et al., | : | NO.  06-3254 |
| Respondents. | : | |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    July   13   , 2007

Before the court is the *pro se* petition of Dale R. Peters (alternatively "Peters" or "Petitioner") for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  His petition challenges his state court conviction on grounds that his Sixth Amendment rights were violated due to the denial of counsel at a critical stage of proceedings and the denial of a continuance to allow newly-appointed counsel to prepare effectively for trial.  We also permitted him to amend his petition to add claims that he was denied his right to confront his accuser, that there was insufficient evidence to support his conviction on certain charges, and that he was subjected to prosecutorial misconduct.  For the reasons set forth below, we **RECOMMEND** that the petition be **DENIED**.

## I. _____ PROCEDURAL HISTORY[1]

On January 21, 2000, following a jury trial in the Lancaster County Court of Common Pleas, Peters was convicted of several counts of involuntary deviate sexual intercourse, statutory sexual assault, indecent assault, and corruption of a minor.  (Pet. at 4; Ans. at 1, 3.)  He was sentenced to an aggregate term of imprisonment of 19½ to 39 years.  (Pet. at 4; Ans. at 3-4.)  His conviction was affirmed on appeal by the Pennsylvania Superior Court on November 27, 2001.  (Pet. at 5; Ans. at 4.)  He did not seek review in the Pennsylvania Supreme Court.  (Pet. at 5; Ans. at 4.)

On or about June 21, 2002,[2] he sought relief, *pro se*, under the Pennsylvania Post-Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541-46 ("PCRA").  Counsel was appointed but did not file an amended petition.  The Commonwealth answered the *pro se* petition on April 7, 2004.  The Court of Common Pleas, acting as the PCRA court, advised Peters of its intention to dismiss the petition

---

[1] In preparing this Report and Recommendation, we have reviewed Petitioner's Form Application for Habeas Corpus Under 28 U.S.C. § 2254 ("Pet.") and Memorandum of Law with appended exhibits ("Pet'r Br."), both of which are dated July 22, 2006 (Doc. No. 1); the Lancaster County District Attorney's Answer to the Petition ("Ans.") and appended Memorandum of Law with appended exhibits ("Resp't Br."), filed on November 20, 2006 (Doc. No. 8); Petitioner's Traverse to Respondent's Answer and Consolidated Memorandum of Law ("Pet'r Trav.") and separately bound exhibits dated January 18, 2007 (Doc. No. 17); Petitioner's Motion for Permission to File Amendments to Petition for Writ of Habeas Corpus (Doc. No. 9) and proposed amendments (" Am. Pet.") (Doc. No. 10), with cover letter dated November 20, 2006; Respondents' Answer to the motion for permission to amend ("Resp. to Mot. to Am."), filed January 26, 2007 (Doc. No. 18); and the state court record received from the Clerk of Court of Lancaster County on October 23, 2006, as supplemented at our request on May 8, 2007 by the District Attorney's Office.

[2] Pursuant to the prison mailbox rule, the date a prisoner hands a filing to prison officials for mailing is considered the date his PCRA petition is deemed filed.  *See Commonwealth v. Holmes*, 905 A.2d 507, 509 n.1 (Pa. Super. Ct. 2006).  The PCRA petition filed by Peters is not dated, and we do not see any indication in the state court file as to how it was received.  As it is stamped as having been received for filing by the Clerk of Court on June 21, 2002, we are considering that to be the filing date.

without a hearing and received responses from both Petitioner and his attorney.  (Ans. at 5.)  The

PCRA court denied the petition on December 14, 2004 without holding an evidentiary hearing.

(Ans. at 6.)  Peters appealed the decision to the Pennsylvania Superior Court, which affirmed on

September 30, 2005.  (Pet. at 6; Ans. at 6.)  The Pennsylvania Supreme Court denied his petition for

allocatur on March 21, 2006.  (Pet. at 6; Ans. at 6.)

Peters is currently incarcerated at the State Correctional Institution Greene in Waynesburg,

Pennsylvania.[3]  He initiated the present action on July 22, 2006.[4]  (Pet. at 11.)  The Lancaster County

District Attorney's Office filed its response on November 20, 2006.  (Doc. No. 8.)  On January 18,

2007, Peters submitted a traverse to the answer.  (Doc. No. 17.)  At the same time that the District

Attorney's Office was submitting its response to the initial petition, however, Peters sought

permission from the Court to file an amendment to his petition.  His submission dated November

20, 2006 included proposed amendments setting forth four additional grounds for relief.  (Doc. Nos.

9 & 10.)  We ordered those filings to be served on the District Attorney's Office and sought

Respondents' position on the amendment request.  The District Attorney's Office filed its opposition

to the motion to amend on January 26, 2007.  (Doc. No. 18.)  We granted the motion on July 11,

2007 and deemed the petition amended in accordance with the proposed amendments submitted by

---

[3] We note that while Petitioner is not currently a resident of the Eastern District of Pennsylvania,
venue here is proper in that his current confinement grew out of a prosecution and conviction in
Lancaster County.

[4] Despite the docket sheet's indication that the petition was received for filing on July 24, 2006,
pursuant to the prison mailbox rule, the Court construes the filing date as the date Petitioner hand-
delivered the petition to prison officials.  *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).
We accept that date to be July 22, 2006, the date Peters indicates he "executed" the petition.  (Doc.
No. 1 at 11.)

Peters.  We did not, however, require the filing of a response to the amended claims.  (Doc. No. 20.)

## II.    FACTUAL BACKGROUND

Inasmuch as the original petition concerns the fact that Peters did not have counsel for a period of time prior to trial, we discuss both the key events of trial as well as the circumstances leading up to the trial.[5]

### A.    Pre-Trial Proceedings, Status of Counsel

Following his arrest in August 1998, Peters retained a private attorney, Thomas Quinn, Esquire ("Quinn"), who filed an omnibus pre-trial motion to suppress certain evidence and statements and seeking a continuance of the trial scheduled for January 1999.  Peters alleges, however, that Quinn did not respond to letters or phone calls from Peters or his family, causing Peters to file a *pro se* motion in April 1999 for the appointment of counsel.  (Pet. at 9A.)  On September 3, 1999, the court appointed Douglas Johnson, Esquire ("Johnson") from the Public Defender's Office to represent Peters.[6]  According to Peters, however, Johnson did not prepare for

---

[5] While Petitioner's claims relating to the alleged denial of his right to counsel specifically concern events in the month leading up to the January 2000 trial, we describe some of the earlier history of his case, as that context appears to have influenced the court's rulings closer to the time of trial.

[6] The record before us does not include a transcript of any proceeding held on this date.  However, one of Petitioner's subsequent filings in state court refers to the fact that "on September 3, 1999 defendant was taken before Judge Perezous and at that time, Judge Perezous asked defendant if he wanted counsel appointed to represent him.  Defendant informed the Judge that he wished to proceed Pro-se [sic], with a standby counsel so the defendant would have some control over filing motions and of finally getting this case to trial."  (Mot. for Appt. of New Counsel, Pro-Se, dated Dec. 3, 1999, at ¶ 11.)

Although not referred to in Petitioner's filings in this Court, an exhibit to Peters's PCRA petition includes an August 5, 1999 letter from Attorney Quinn to Peters explaining that personal matters had consumed a great deal of his time recently and apologizing if Peters has been uninformed as to his case.  The letter communicated a proposed plea agreement that Quinn recommended Peters seriously consider.  *See* PCRA Pet., 6/21/02, at Ex. G.  The plea agreement

trial because he believed that his client should accept a plea offer.  (Pet. at 9B.)

On November 15, 1999, the case was called before the Honorable Wilson Bucher.  The prosecutor advised the court that Peters "wishe[d] to fire his counsel."  (N.T. 11/15/99 at 2.) Attorney Johnson confirmed this, stating that Peters "indicated to me he wants to fire me.  He also sent me correspondence where he wanted me to immediately withdraw representing him."  (*Id.*) Judge Bucher asked Peters if he wanted to represent himself, to which Peters responded that "I asked to do that the last time in front of Judge Perezous with a standby counsel, and for some reason they denied it and appointed me counsel.  I didn't want counsel.  I wanted standby counsel."  (*Id.* at 3.) In response to the court's observation that more than a year had passed since his preliminary hearing, Peters stated that he wanted to go to trial and referred to letters he had sent to another judge telling him that he was proceeding *pro se.*  (*Id.*)  Judge Bucher asked Peters if he understood the charges against him and the sentence that could be imposed and whether he "still want[ed] to go ahead and be [his] own counsel."  Peters responded that he "wanted to be appointed standby."  (*Id.*)  The court responded:  "If I permit that, you're still going to have standby counsel.  You're not going to fire anybody.  If I appointed him to sit by you, that's what he's going to do."  (*Id.*)  Peters indicated that he understood this.  The court again asked if Peters "want[ed] to be [his] own counsel."  He responded, "Yes, Your Honor."  (*Id.* at 4.)  After considering the question of when trial should begin given that Peters had prepared motions that he wanted the court to consider, Judge Bucher continued the case until January.  In response to a question from Attorney Johnson about whether Peters was being allowed to represent himself, Judge Bucher stated that he would "let the future trial Judge

---

took into account a wiretapping charge pending against Peters that was ultimately severed from the trial of the sexual assault charges.

decide that." (*Id.* at 7.)  He then directed Peters to give the *pro se* motions that he wanted to be filed "to [his] attorney," e.g., Johnson, and that Johnson would give them to the clerk.  (*Id.* at 8.)

On December 7, 1999, the court received a "Motion for Appointment of New Counsel, Pro-Se" on behalf of Peters.[7]  The motion recounted the difficulties Peters experienced with Attorney Johnson but did not make reference to the November 15, 1999 hearing at which Peters requested to proceed *pro se* and with only standby counsel.  It requested that the court "appoint him new counsel not associated with the public defenders office so that he can proceed with trial with some hope of an acquittal" and that "defendant is only seeking a fair trial and is not seeking to shop for a certain specific lawyer."  (Mot. for Appt. of New Counsel, Pro-Se, dated Dec. 3, 1999, at ¶¶ 23-24.)  In response, the Honorable Michael A. Georgelis issued an order on December 9, 1999, deeming "Defendant's Motion for Appointment of New Counsel" to be withdrawn, as "[t]he Defendant has advised the Court that he is proceeding pro se."  In this order, the court also formally granted leave to Attorney Johnson to withdraw as counsel.  The order further stated that "even though the Defendant is entitled to free counsel, he is not entitled to free counsel of his choice."  (Order, 12/9/99.  *See also* Pet. at 9C.)[8]

On January 11, 2000, the court appointed Mark Walmer, Esquire as stand-by counsel.  (Pet.

---

[7] We note that the motion, dated December 3, 1999, was typed (unlike Petitioner's other filings while detained pending his trial) and appears to bear a different signature for Peters than his other filings. The state court record does not indicate the manner in which the filing was transmitted to the court.

[8] On December 15, 1999, the same judge entered another order, referring to the December 9th order, granting leave to both the Office of the Public Defender and to Attorney Johnson to withdraw as counsel.

at 9C.)[9]  The following week, on January 18, 2000, the Honorable Michael J. Perezous, who would

be the trial judge, held a hearing on the various pretrial motions filed by the prosecution and Peters.

Attorney Walmer was present.  When Judge Perezous asked Peters at the beginning of the hearing

if he was proceeding *pro se*, Peters answered "yes." (N.T. 1/18/00 at 3.)  Shortly into the questioning

of the first witness, however, Attorney Walmer raised with the court at Petitioner's request the fact

that "there is an open motion for appointment of new counsel."   The court permitted Peters to

address that subject.  (*Id.* at 7-8.)  Peters explained that he had sought to proceed *pro se* so that he

could file his own motions, which his attorney would not file for him.  (*Id.* at 8.)[10]  He explained that

he was told he could proceed *pro se* on November 15 but that he "asked to have counsel appointed

for me on December 3rd."  (*Id.* at 9.)  Judge Perezous referred to the prior ruling by Judge Georgelis

of December 9 that deemed the motion for appointment of new counsel to be withdrawn in light of

the fact that Peters had advised the court that he was proceeding *pro se*.  (*Id.*)  The court then stated:

"Well, Mr. Peters, your case has been, in common parlance, hanging around for an inordinate period

of time."  (*Id.* at 10.)  Peters protested that the delay was due to the fact that the clerk would not

accept his *pro se* motions while the attorney who had long ago abandoned him was still listed as

---

[9] The record before us does not reflect how Attorney Walmer came to be appointed or whether any
other events in this case occurred on that date.  No written order from this date appears in the state
court record nor does the docket sheet indicate any activity in the case on January 11, 2000.

[10] Peters appears to be referring in his testimony to his first attorney, Quinn, and not Johnson, as he
makes a reference to the clerk's office sending his *pro se* motions "to this attorney in Philadelphia"
and refusing to accept for filing a motion without his signature unless Peters was proceeding *pro se*.
(N.T. 1/18/00 at 8.)  Attorney Quinn's practice was located in Philadelphia, while Attorney Johnson
was based out of Lancaster.  (Pet. at 10, ¶ 15(b).)

counsel of record.  (*Id.*)[11]  The court responded: "Something happened between you and Mr. Quinn, your Philadelphia counsel.  That's why you were appointed stand-by counsel.  We're not going to delay this any further.  We're going to proceed and you can represent yourself or not represent yourself and Mr. Walmer will be available as stand-by counsel.  But we're going ahead with this case." (*Id.* at 10.)  Peters responded: "I can understand that.  But I asked for regular counsel." (*Id.*)  The court concluded the matter with the statement: "Well, that request is denied." (*Id.*)  The court proceeded with the hearing on the pretrial motions, denying his motion challenging probable cause for his arrest and his motion to dismiss under Rule 1100.[12]  (N.T. 1/18/00 at 27, 36-40.  *See also* Pet. at 9C, 9D.)  Attorney Walmer's participation in the hearing was limited to some argument on the Rule 1100 issue and his client's need to meet with witnesses prior to trial.  (N.T. 1/18/00 at 24-27.)

After resolving the pretrial motions, the court indicated that it was ready to proceed to jury selection.  The court asked Peters whether he was "satisfied with stand-by counsel being present" or whether he wanted the court "to consider the appointment of regular counsel to represent" him.  Judge Perezous then specifically asked Peters whether he "still want[ed] to represent [him]self?"  Peters responded that he "wouldn't mind if [Walmer] represented him." (*Id.* at 41.)  The court asked if he meant as his "regular attorney," to which Peters answered "Yes, sir." (*Id.*)  The court indicated that it could appoint Walmer to serve as his "regular counsel." (*Id.*)  Walmer, however, voiced his

---

[11] The transcript attributes this statement to "Mr. Walmer."  However, it appears clear from the context that the speaker of this statement would have been Peters, not his stand-by counsel, who had not spoken since making the request that the court interrupt the hearing on the Rule 1100 motion to consider the "open motion" for appointment of counsel.

[12] Now Rule 600 of the Pennsylvania Rules of Criminal Procedure, this rule provides for a speedy trial.

concern that he received his appointment as stand-by counsel only a week earlier and that, while he did meet with Peters at the prison, "there seem to be voluminous records in this case, as well as [Peters]'s preparation for this trial." (*Id.*) Walmer contrasted his preparation of less than a week to Peters's preparation for over a year and stated that he was "more comfortable being stand-by counsel or co-counsel." (*Id.* at 42.) He explained that if he were put in the position of lead counsel, he would not be prepared and would have to request a continuance, which he said would work against his client's interest. (*Id.*) The court commented that Peters could not "have it both ways" — expressing dissatisfaction with his lawyer and then complaining about his case being continued. (*Id.*) Peters responded that he understood, that this was just how things worked out, and that his intention was not, as the court suggested, to "jerk[] the system." (*Id.*) Judge Perezous then appointed Walmer as "co-counsel," which, he explained to Peters, meant that Walmer could conduct whatever portions of the trial that Peters felt comfortable with him conducting (including opening and closing) and that Walmer would be available for consultations as to objections to the admissibility of evidence. (*Id.* at 43.)

Upon Walmer's appointment as co-counsel, he and Peters then requested a continuance until the March term so that Walmer could continue his preparations. (*Id.*) In response, the prosecution noted that it had just finished defending against a speedy trial motion filed by Peters and that the Commonwealth had been ready to proceed when the case was listed a week earlier. (*Id.* at 43-44.) Judge Perezous stated that he "can't very frankly get past the impression that Mr. Peters is still trying to milk the system" and denied the motion for a continuance. (*Id.* at 44.) Peters asked the court to check the record because he was "appointed an attorney, I think, three different times. And each time I was appointed an attorney, they come in and told me they couldn't represent me." (*Id.* at 45.)

9

Judge Perezous responded that he was not aware of that, but that "I think we've reached a point where this case is going to proceed." (*Id.*)  The court proceeded to address, with the benefit of Walmer's participation, an issue involving the permissible scope of cross-examination of the accuser under Pennsylvania's Rape Shield Law.  Jury selection began shortly thereafter.

Following the seating of the jury the next day, Peters and Walmer put on the record that it was Peters's wish that Walmer appear during the trial as the primary counsel.  (N.T. vol. I, 1/19/00, at 122.)  The court then proceeded to consider issues raised in a motion that Peters had filed *pro se*.  During the course of that hearing, Walmer moved for a continuance, citing the volume of materials Peters prepared for trial and over a hundred pages of discovery, which he did not have an opportunity to review fully the night before.  (*Id.* at 126.)  Judge Perezous stated that he would reconsider the motion for continuance and proceeded to review the procedural history of the case and the history of the appointments of counsel made in the case.  He concluded:

> We got to the point where Mr. Peters would represent himself pro se and then he felt he was being forced to do that.  And we also got to the point where stand-by counsel was appointed for Mr. Peters and finally we're where stand-by status was appointed to co-counsel with Mr. Peters and I'm not going to delay the trial any further.
> I think that basically the trial is going to boil down to an issue of credibility of the victim and we're going to permit a latitude for both defense counsel and the Defendant to explore that.  So your motion upon further consideration is again denied.

(*Id.* at 127.)  Opening statements began later that afternoon and testimony began on January 20, 2000.

### B.  The Trial

The trial testimony concerned several consensual and nonconsensual sexual encounters in various locations in Lancaster County allegedly initiated by Peters in the first half of 1998 with a

single victim, 14-year-old D.B.  Peters was 53 years old at the time and was a friend and neighbor of D.B.'s boyfriend's family.  D.B. testified that she succumbed to Petitioner's pressure to engage in the various sexual activities because he threatened to tell her 15-year-old boyfriend untrue things about her that she feared would cause him to break off their relationship.  The defense theory of the case was that D.B. made up the allegations in retaliation after Peters told her boyfriend of her liaisons with other boys and men.  The defense focused on inconsistencies in the various statements given by D.B. as evidence of fabrication.  It also pointed to a lack of any physical evidence of sexual activity between Peters and D.B.

Walmer conducted all of the defense questioning of the witnesses.  His cross-examination of his client's accuser was extensive.  After approximately two and a half hours of cross-examination, and during an afternoon recess, Judge Perezous asked Walmer if he thought he was going to be able to finish by 5:00 p.m. that day.  Walmer responded that finishing in that time "would be optimistic."  Judge Perezous noted the time that had already been expended and stated that "I'm going to pretty soon start putting some limitations on you" and that "there has to be a stop or a halt to this at some point."  He directed Walmer to "point towards finishing up your cross-examination of this witness today by 5:00."  (N.T. vol. II, 1/20/00, at 301.)  At a later break, Walmer explained to the court that his client had prepared approximately 1600 cross-examination questions relating to factual details and inconsistencies in the victim's statements and that Peters felt he was being directed by the court to "trim his questions."  Judge Perezous reiterated the amount of time that already had been spent on this witness and stated that "what I've noticed is that some of these questions are getting repetitive."  He also observed that the cross-examination seemed to be taking longer due to Walmer's need to consult with Peters between questions and the need to whittle

through his client's list of questions.  He stated that he would revisit the issue if necessary at the end of the day, but indicated that "[he did not] think [he was] going to be inclined to permit much more cross examination after that."  (*Id.* at 332-33.)  Walmer explained that he was not as prepared as he would have liked, given the volumes of questions and the other circumstances that had led him to request a continuance earlier.  He expressed concern about the image he was portraying to the jury, but the court assured him that "the record speaks for itself with respect to the professional manner in which you've been asking the questions."  (*Id.* at 333.)  Walmer concluded his cross-examination that afternoon.  (*Id.* at 340.)  There was time left in the afternoon session for redirect examination, which concluded by 4:30 p.m.  (*Id.* at 341-44.)  Before concluding for the day, the jury also heard testimony from D.B.'s boyfriend.  The following day, the Commonwealth presented testimony from three police officers who investigated D.B.'s allegations.

Peters took the stand in his own defense and was the only defense witness that testified.  He contested many of the facts to which D.B. testified at trial.  He testified that D.B.'s boyfriend grew angry with him for relaying, at D.B.'s request, her complaints about his sexual performance and for advising the boyfriend's mother that her son was sexually active.  He also testified that D.B. expressed to him her anger that he relayed to her boyfriend information about another young man with whom she had been involved and that she was jealous of Petitioner's close friendship with her boyfriend.  (*Id.* at 425-57.)  His answers on cross-examination also sought to point to inconsistencies in his accuser's statements.  (*See, e.g., id.* at 489.)

Walmer presented the closing argument for the defense.  He encouraged the jury to carefully review the criminal informations and the particular allegations contained therein, being sure not to convict as to any contact that was not proven.  As expected, he challenged D.B.'s credibility and

12

motivation to accuse his client of this misconduct.  He argued that Peters would not take the risk of engaging in this type of criminal behavior given the consequences of violating his parole on a prior burglary conviction.  Following the Commonwealth's closing, the court charged the jury.  After a few hours of deliberations, the jury returned guilty verdicts as to all 19 counts against Peters.

## III.   DISCUSSION

The original petition filed by Peters identifies two grounds for relief: (1) that he was denied counsel at a critical stage of criminal proceedings, in violation of his Sixth Amendment rights; and (2) that the trial court's denial of a continuance in January 2000 "constructively denied Petitioner his Sixth Amendment right to effective assistance of counsel at trial."  (Pet. at 9-A, 9-G; Pet'r Br. at 10, 15.)  His amendment to his petition sets out four additional claims: (1) that he was denied his right to confront his accuser because the court placed limitations on the time his attorney had to cross-examine her at trial; (2) that, in violation of his due process rights, he was convicted of assaults for which no testimony was presented to indicate that the assaults occurred; (3) that he was subjected to prosecutorial misconduct because the victim was allowed to testify about assaults for which he was not charged; and (4) that he was subjected to prosecutorial misconduct because the victim was "knowingly permitted" to testify falsely at trial.  (Am. Pet. at 9-K, 9-N, 9-O, 9-P, 9-R.)

We proceed to consider each of the claims raised by Peters.

### A.   Denial of Assistance of Counsel at Critical Stage

In Ground One of his petition, Peters asserts that his Sixth Amendment right to counsel was violated because he was denied counsel at a critical stage of the state court proceedings.  This alleged violation was effectuated when, on December 9, 1999, Judge Georgelis's order left him to proceed *pro se* despite his request, by motion dated December 3, 1999, for new counsel.  As a result, he was

unrepresented in the month leading up to trial and was "compelled to proceed pro se throughout the hearing on omnibus pretrial motions, which entailed cross-examination and arguing complex legal issues." (Pet. at 9D.)  He also complains that Judge Perezous's denial of his "specific request for appointment of counsel" — e.g., regular counsel — at the hearing on the pretrial motions was "egregious," as "[t]he outcome of the omnibus pretrial motions was crucial to the defense and, unquestionably, a critical stage of the proceedings." (Pet. at 9E.)  In short, he complains that his Sixth Amendment rights were violated because he was "unrepresented more than 30 days before trial, and during the hearing on omnibus pretrial motions, and at no time did petitioner make a voluntary, knowing and intelligent waiver of counsel." (Pet. at 9F.)  Respondents contend that we cannot grant relief on this claim because it is unexhausted and procedurally defaulted due to Petitioner's failure to raise this claim in state court.  (Resp't Br. at 9.)

We first explore the nature of the exhaustion requirement and the consequences of a procedural default and then consider the implication of these rules on Petitioner's first claim.

### 1.        Exhaustion of state remedies, procedural default

A prerequisite to the issuance of a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment is that the petitioner must have "exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  In order for a petitioner to satisfy this requirement, he must give the state courts "one full opportunity to resolve any constitutional issues" "by invoking one complete round of the established appellate review process" in which he "fairly presents" his federal claims.  *Picard v. Connor*, 404 U.S. 270, 275 (1971); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  "Fairly presenting" a federal claim to the state courts requires the petitioner to present the factual and legal substance of the claim in such a manner that the state court

14

is on notice that the federal claim is being asserted.  *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  If a petitioner has not "fairly presented" a claim to the state court and state relief is no longer available because, for example, it is now time-barred due to a state limitations period, the petitioner will be deemed to have procedurally defaulted those claims.  *O'Sullivan*, 526 U.S. at 848. In such a case, he is ineligible for federal habeas relief unless he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or [unless he] demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  *See also Teague v. Lane*, 489 U.S. 288, 308 (1988) (plurality opinion); *Wainwright v. Sykes*, 433 U.S. 72 (1976).  This procedural default doctrine and the cause and prejudice standard are "grounded in concerns of comity and federalism."  *Coleman*, 501 U.S. at 730.

To establish cause, the petitioner must show "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Attorney error rising to the level of a Sixth Amendment violation under *Strickland v. Washington*, 466 U.S. 668 (1994), may establish "cause," but such ineffectiveness first must have been properly presented to the state courts as an independent claim.  *See Carrier*, 477 U.S. at 488; *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000).  To establish prejudice, the petitioner must show "actual prejudice resulting from the errors of which he complains."  *McCleskey v. Zant*, 499 U.S. 467, 494 (1991).  The fundamental miscarriage of justice exception requires that the petitioner supplement his claims with a "colorable showing of factual innocence."  *Id.* at 495.  The burden is on the petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

### 2.      Petitioner's exhaustion of state remedies as to this claim

Respondents' answer does not identify the nature of the claims raised by Petitioner on direct appeal or PCRA review but simply states that "Petitioner failed to raise his first claim, that he was denied his 6th Amendment right to counsel at a critical stage of the proceedings, to either the trial court or the appellate courts." (Resp't Br. at 9.)  In response, Peters acknowledges that he did not raise the issue on direct appeal but contends that he raised this claim in his *pro se* PCRA petition and in subsequent *pro se* and counseled filings with the PCRA court. (Pet'r Trav. at 6-9.)  He contends that the issue he raised in the Superior Court — the lower court's dismissal of his PCRA petition without holding an evidentiary hearing — sufficiently implicated his Sixth Amendment claim as to satisfy his obligation to have "fairly presented" that claim to the state appellate court. (*Id*. at 11-13.)  He contends that the failure of the Superior Court to have ruled on his Sixth Amendment claim reflects that court's misapprehension of the issue.  (*Id.* at 9-10, 13.)  It is incumbent upon us, therefore, to examine this history of how this claim has been presented in order to determine whether Peters has exhausted the relief available to him in state court.

Peters raised a number of issues in his PCRA petition, to which he appended various supplemental pages and exhibits in the nature of a brief.  He described the first of his claims under the following heading:

> (A). COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE, OBJECT, ARGUE AND PRESERVE FOR POST-TRIAL OR APPELLATE REVIEW, THE TRIAL COURT'S ABUSE OF DISCRETION IN DENYING THE DEFENDANT HIS CONSTITUTIONAL RIGHT TO COUNSEL WHEN THE TRIAL COURT ERRONEOUSLY RELIED ON A PRIOR COURT DECISION TO REMOVE PUBLIC DEFENDER APPOINTMENT FROM THE DEFENDANT'S CASE, AND THEN FORCED THE DEFENDANT TO PROCEED PRO SE DURING CRITICAL

16

STAGES OF THE PROCEEDINGS WITH STANDBY AND CO-COUNSEL APPOINTMENT ONLY.

(PCRA Pet., 6/21/02, at 3 A-1.)[13]  His petition proceeded to recite the history of his representation in the case.  (*Id.* at 3 A-1 through 3 A-3.)  He contended that the court erred in denying his request for appointment of counsel on January 18, 2000 and in removing court-appointed counsel and forcing him to proceed *pro se*, errors which were not cured by appointing standby or co-counsel.  (*Id.* at 3 A-4 through 3 A-5; *id.* at 3 A-9.)  His argument cited to both Pennsylvania and United States Supreme Court cases regarding the necessity of legal counsel in a criminal proceeding.  (*Id.* at 3 A-10.)  He proceeded to allege that Attorney Walmer was ineffective for failing to raise and preserve these issues on appeal.  (*Id.* at 3 A-13.)

We recognize the underlying constitutional issue of this claim as essentially the claim Peters raises in Ground One of his federal habeas petition: that he did not have the benefit of "regular" counsel leading up to the time of trial in violation of the Sixth Amendment.  We thus disagree with the assertion of Respondents that "Petitioner failed to raise his first claim, that he was denied his 6th Amendment right to counsel at a critical stage of the proceedings, to either the trial court or the appellate courts," (Ans. at 9), as Peters *did* raise this issue before the PCRA trial-level court, albeit layered in an ineffective assistance of counsel claim.[14]

---

[13] The counsel to whom Peters attributes this ineffectiveness is Walmer, who was appointed his "regular" counsel following the trial and served as such in the direct appeal process.  (*See* Order, 2/4/00.)  Consistent with the claim asserted in the PCRA petition, the record reflects that, while the appeal of the conviction was pending before the Superior Court on direct review, Walmer sought to withdraw from the case because "Defendant has indicated he believes counsel's appeal failed to raise meritorious issues."  (Mot. for Appt. of New Counsel, 6/4/01, at ¶ 5.)

[14] We note that the PCRA court appears to have interpreted the issues raised by this claim differently.  In its opinion supporting the dismissal of the PCRA petition, the PCRA court observed that "[t]he

Something more, however, is required before a petitioner is deemed to have exhausted state remedies: in Pennsylvania, the issue must have been presented at least to the Superior Court.  In this case, it was not.  On appeal to the Superior Court, Peters raised as an issue only "WHETHER THE PCRA COURT ERRED IN DISMISSING THE PETITION FOR POST-CONVICTION RELIEF WITHOUT A HEARING?"  (Br. of Appellant to Pa. Super. Ct., 3/21/05, at 4.)  His brief focused on his claim that his rights were violated when the court denied the continuance requests he made on January 18 and 19, 2000, and that Walmer performed ineffectively in his cross-examination of the accuser and in his failure to investigate defense witnesses.  Peters argued in the brief that "[a] hearing was required to develop a record on the prejudice sustained by the defense due to the court's refusal to continue the case, the testimony and availability of the uncalled witnesses, and other matters left undone in the hastily improvised defense.  Fact-finding was also required to develop Mr. Walmer's reasons, if any, for not raising the continuance issue on direct appeal." (Br. of Appellant, 3/21/05, at 10.) (*See also id.* at 12 (summary of argument that dismissal of petition without hearing was improper because of genuine issues of material fact).)  Peters asserted that the court incorrectly

---

Defendant also contends that he is entitled to post-conviction relief based upon counsel's ineffectiveness regarding the trial court's appointment of standby counsel, who was later appointed as co-counsel." (PCRA Ct. Op., 12/14/04, at 5.)  The court proceeded to explain that "[t]he decision as to whether a defendant may act as co-counsel is within the sound discretion of the trial court," and that, at the time of the appointment of co-counsel, Peters "was in agreement with the trial court's action." (*Id.* at 5-6.)  The court concluded that Peters was not prejudiced by prior counsel's failure to have raised this issue on direct appeal because there was not a reasonable probability that the outcome of the proceedings would have been different had he done so.  (*Id.* at 6.)  It appears to us that the PCRA court misapprehended that the trial court action with which Peters took issue was not the appointment of Walmer as co-counsel following the conclusion of the hearing on January 18, 2000 but rather: (1) the order of December 9, 1999 that left him completely *pro se*, without the benefit even of standby counsel until January 11, 2000; and (2) the denial of his request at the beginning of the January 18, 2000 hearing for the appointment of "regular" counsel, as opposed merely to standby counsel.

applied the Pennsylvania rule of criminal procedure applying to disposition of PCRA petitions without evidentiary hearings because he has "presented a *prima facie* case of ineffective assistance of appeal counsel." (*Id.* at 26.)  The brief concluded with a request that the matter be "remanded to the trial court for a hearing on the alleged ineffective assistance of appellate counsel, and the related issues of prejudice, the ineffective cross-examination of the complaining witness and the failure to call witnesses on the Appellant's behalf." (*Id.* at 27.)

In his briefs to this Court, Peters makes a valiant attempt to link his Sixth Amendment denial of counsel claim to the issue he presented to the Superior Court on PCRA review.  (*See, e.g.,* Pet'r Trav. at 10-12.)  While he can point to citations in his brief to the Superior Court that refer to pages of his PCRA petition on which the Sixth Amendment denial of counsel claim is mentioned, we do not find that to satisfy his responsibility to "fairly present" to the Superior Court on PCRA review his issue as to the denial of counsel.  Rather, the issue appears to have been abandoned, as the clear focus of his brief to the Superior Court was the fact that the PCRA court failed to give him an opportunity to develop the record on his claims as to which there were disputed facts that could have entitled him to relief.  Peters suggests that the blame for the failure to consider the denial of counsel issue falls on the court, citing to Pennsylvania case law for the proposition that the reviewing court must consider each issue raised in the PCRA petition to determine whether the lower court erred in concluding that there were no genuine issues of material fact in controversy.  We do not read those cases, however, to require that the Superior Court consider issues that appear to have been abandoned on appeal and not discussed in an otherwise articulate, well-organized, counseled brief.  Therefore, we are constrained to conclude that Peters did not exhaust available state court remedies as to his claim that he was denied counsel during a critical stage of pre-trial proceedings in violation

of the Sixth Amendment.  As further litigation of this claim is not available to him in the state court due to the PCRA limitations period, the claim may be considered procedurally defaulted.

### 3.        Basis to excuse procedural default

Petitioner's Traverse demonstrates that he appreciates that if we find this claim to be procedurally defaulted, we cannot consider the merits of the claim unless he establishes "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the default.  (Pet'r Trav. at 17-18 (quoting *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999).)  He asserts in his Traverse that both tests are satisfied.[15]  We do not agree.

### a.        Cause and prejudice

As Peters recognizes, "[c]ause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." (Pet'r Trav. at 19 (citing *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).)  Peters contends that he has established cause "in the PCRA court's frustration of his efforts to utilize the state collateral process to redress the constitutional deprivations set forth in his PCRA petition. . . .  The PCRA judge's blatant arbitrariness in his cavalier treatment of petitioner's effort to develop his PCRA claims in accordance with the Rules Governing PCRA cases created such a 'procedural morass' that it declineated [sic] the Post-Conviction process to nothing more than a 'hollow exercise.'" (Pet'r Trav. at 19.)  While we are sympathetic to the fact that the PCRA court does not appear to have

---

[15] For their part, Respondents mention in passing that a procedurally defaulted claim "may not be reviewed absent a showing of cause for the default and prejudice or a showing that failure to review the claim would result in a 'fundamental miscarriage of justice.'" (Ans. at 8 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).)  Their papers do not, however, explore how either of these exceptions might apply in this case.  (*See, e.g.*, Ans. at 9 (asserting only that the claims fail to meet the exhaustion requirement).)

squarely addressed the denial of counsel claim that he raised in his PCRA petition and apparently

misconstrued his claims as having been previously litigated, *see* note 14, *supra*, the opportunity to

rectify that situation presented itself when Peters appealed to the Superior Court.  Peters did not avail

himself of that opportunity.  He has not identified any "external impediment preventing counsel from

constructing or raising the claim" to the Superior Court.  Therefore, he has not satisfied the cause

and prejudice exception to the procedural default doctrine.[16]

### b.    Fundamental miscarriage of justice

Notwithstanding notions of comity and the respect that must be accorded to state court

judgments, a federal court may consider the merits of a claim forfeited under state law where failure

to do so would result in a fundamental miscarriage of justice.  The miscarriage of justice exception

represents "an effort to balance the societal interests in finality, comity, and conservation of scarce

judicial resources with the individual interest in justice that arises in the extraordinary case."  *House*

*v. Bell*, 126 S. Ct. 2064 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  "In the usual

case the presumed guilt of a prisoner convicted in state court counsels against federal review of

defaulted claims.  Yet a petition supported by a convincing *Schlup* gateway showing" justifies a

review of the merits of the constitutional claims.  *House*, 126 S. Ct. at 2077.  Pursuant to this

doctrine, review of the merits is warranted if the petitioner "presents evidence of innocence so strong

that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that

the trial was free of nonharmless constitutional error."  *Schlup*, 513 U.S. at 316.  This standard

"requires the habeas petitioner to show that 'a constitutional violation has probably resulted in the

---

[16]   Because no cause for the default has been demonstrated, we need not address the prejudice
component of this standard.  *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

conviction of one who is actually innocent.'" *Id.* at 327.  The petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Id.*  (*See also* Pet'r Trav. at 29 (citing *Schlup* standard).)  This "gateway" claim requires "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *House*, 126 S. Ct. at 2001 (citing *Schlup*, 513 U.S. at 324).  The court is to assess the likely impact on reasonable jurors of "all of the evidence, old and new, incriminating and exculpatory." *Id.* (citing *Schlup*, 513 U.S. at 327-29).

Peters does not point to any new specific evidence bearing on his innocence but instead argues that he should be given an evidentiary hearing to allow him to develop the record in this regard. (Pet'r Trav. at 30-31.)  He refers to 10 potential defense witnesses that would have testified at trial had counsel interviewed them, referring to specific pages of his PCRA petition for their proposed testimony.  He argues that his conviction was only weakly supported by the record, which makes it more probable that denial of counsel during critical stages worked to bring about his conviction and that the testimony of these witnesses would more likely than not have resulted in an acquittal.  (Pet'r Trav. at 30, 32.)  His papers in this court do not demonstrate how the testimony of these witnesses likely would have swayed the jury.

As in *Schlup*, the question of the application of the miscarriage of justice standard in this case arises in the context of a request for an evidentiary hearing.  This Court "must assess the probable force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 332.  In so doing, "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.*  "[T]he standard requires the district court to make a probabilistic determination about what reasonable,

properly instructed jurors would do," *id.* at 329, or put another way, "what reasonable triers of fact are likely to do." *Id.* at 330.

We have reviewed the pages Peters identified of his PCRA petition (pages 3A-63 through 3A-68) that purportedly set forth the proposed testimony of these witnesses. These pages of the PCRA petition constitute a "witness certification list," outlining the "substance of testimony" of various individuals, including: D.B.'s boyfriend's mother and brother; one of the boys with whom D.B. was engaged in sexual activity; Petitioner's daughter; persons to whom D.B. allegedly confessed that she had made up the accusations against Peters; and persons with knowledge of Petitioner's alleged impotency. The only allegations supported by affidavits[17] were the claim that Peters was impotent and that he did not possess a key to his sister's home, which was a location at which D.B. initially informed police an early encounter had occurred.[18] None of the affidavits indicated that the affiant was available and willing to testify at trial.[19]

We will assume, for purposes of this review, that the witnesses listed in the PCRA petition that Peters incorporates by reference would testify credibly at an evidentiary hearing in accordance

---

[17] The proferred testimony of D.B.'s boyfriend's brother was in the form of a police memorandum of a telephone interview conducted in August 1998. The witness expressed his opinion about whether he thought D.B. or Peters was telling the truth and suggested the police speak with two individuals to whom D.B. reportedly stated that nothing happened with Peters and that she lied about her accusations. *See* PCRA Pet., 6/21/02, at Ex. AA.

[18] Although referred to in an August 3, 1998 statement to the police, *see* PCRA Pet., 6/21/02, at Ex. M, the alleged incident at the house of Peters's sister did not form the basis of any of the charges brought in this trial and the prosecution did not elicit any testimony on this subject at trial.

[19] On the contrary, the statement signed by Peters's girlfriend dated January 13, 2000 and concerning his impotency stated that she was "mak[ing] this affidavit solely because I cannot attend the trial of Dale Peters due to my recent employment." The trial began the week after this written statement, which was not notarized, was signed.

with the substance Peters identifies.[20]  We do not believe, however, that even with this amplified

record, we could say that "it is more likely than not that no reasonable juror would have convicted"

Peters.  *See Schlup*, 513 U.S. at 327.[21]

---

[20] If we did not reach the conclusion that this new evidence was ultimately insufficient for a gateway as a matter of law, the Court would need to hold an evidentiary hearing in order to assess the reliability of the proposed evidence and determine how the amplified record likely would have affected the jury's verdict.  *See Schlup*, 513 U.S. at 332 (remanding to lower court).

[21] The evidence Peters proffered as part of his PCRA petition consists of the following:

(1) Doreen Loreto: According to Peters, the mother of D.B.'s boyfriend would: (a) contradict D.B's preliminary hearing testimony as to whether or not she and her boyfriend had spent time at Petitioner's home at a particular time in January 1998; (b) testify that D.B. did not make any allegations of sexual assaults until Peters exposed in front of the boyfriend's family that she had had sex with other boys, which exposure caused D.B. to threaten to have Peters arrested; and (c) testify that D.B. had deceived her about her activities with her son.  We find this proffered evidence to be neither so material nor so new that it would likely have affected the jury's evaluation of this case.

(2) Steve Loreto: According to Peters, the brother of D.B.'s boyfriend would: (a) testify as to D.B.'s reputation as a liar; and (b) clarify that a particular encounter between his brother and Peters was initiated by the boyfriend at D.B.'s request and not by Peters.  Again, the issue as to D.B.'s credibility was an issue that was well-identified in trial.  The significance as to who initiated a particular conversation is not so great that we believe it would have to have resulted in an acquittal.

(3) Thomas Menard: According to Peters, this one-time boyfriend of D.B. would testify that: (a) she spread rumors about him exposing himself to her, as Peters claims she did to him; and that (b) contrary to her testimony that Peters would call her only when she was home alone in the mornings, in fact her parents and brother were often home when Peters would call to make sure she was ready for him to pick her up and drive her to school.  Again, we conclude that this proffered impeachment goes to a detail too far removed from the substance of the issues as to have any likelihood of impacting the jury in any serious way.

(4) Tonya Houlton: According to Peters, his daughter would testify that: (a) "she was aware of" D.B.'s threats to get even with Peters for telling her boyfriend about her other affairs; (b) that D.B. never gave any indication there was anything wrong with Peters, of whom she regularly requested rides to school; (c) that Peters would not have been able to meet D.B. around midnight in an alley because he was home with her during May and June of 1998.  Again, we do not find this testimony persuasive enough that it would require a reasonable jury to acquit Peters.  We also note that the proffered alibi evidence is not airtight, as D.B.'s testimony dated the encounters in the alley to between February and April.  (*See* N.T. vol. II, 1/20/00 at 180-84, 243.)

(5) Beth Metzger: According to Peters, his sister would contradict D.B.'s statement to the police that Peters took her to Ms. Metzger's home for an assault.  This testimony, however, concerns an accusation for which Peters was not charged.  Therefore, we do not believe it would have been

We find that Peters presents insufficient allegations to warrant our holding an evidentiary hearing at which the credibility of these witnesses could be more fully assessed: the evidentiary proffer Peters made goes over much of the same territory covered at trial (including D.B.'s credibility and motivations and the impact of Peters's alleged impotency), although often relying on hearsay and hearsay within hearsay.  Peters does not "present[] evidence of innocence so strong that a court cannot have confidence in the outcome of the trial" without reviewing the matter for constitutional error.  *Schlup*, 513 U.S. at 316.  The evidence he presents is not "new reliable evidence," such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *House*, 126 S. Ct. at 2001, but rather is cumulative evidence regarding D.B.'s credibility and motivations and cumulative evidence regarding Peters's alleged ability to have committed certain

_____

admissible at trial nor would have properly affected the jury's consideration of this case.

(6) Jill Kinard: According to Peters, this witness would relate that D.B. told her that she had just made up the accusations because she was angry with Peters for telling her boyfriend of her other liaisons.  Again, this retaliation theory was clearly elucidated by the defense at trial.  We do not believe the testimony of this third party would have been admissible at trial or that it would have required the jury to acquit Peters.

(7) Matthew Markley: According to this witness, D.B. related to him at the end of June 1998 that she had made up the accusations because she was mad at Peters.  Again, we find this evidence cumulative, inadmissible, and unlikely to have affected the jury's verdict.

(8)  Charles Kinard: Peters contends this witness would testify in accordance with his affidavit that Peters spoke to him of his impotency in the months prior to his arrest.  We do not believe this "corroboration" of Peters's testimony about his sexual functioning would have required a reasonable jury to acquit Peters.

(9) Linda Groff: Peters contends that his live-in girlfriend (and ex-wife) would testify in accordance with her statement that Peters had been impotent since 1996.  Again, we do not believe this corroboration of Peters's testimony about his sexual abilities from an interested party would have required a reasonable jury to acquit him.

(10)  Dr. S. Porter: Peters contends that this orthopedist would testify that Peters indicated on a form he completed in 1996 that he was impotent.  We do not believe that this evidence from two years prior to the allegations would have been found so relevant by a jury that it could only have acquitted him.

25

of the acts.

We conclude that Peters has not met his burden to show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Therefore, he cannot "pass through the gateway" for a review of the merits of his first claim. We will not excuse the procedural default of his first claim and consider its merits.

### B.      Denial of Continuance Requests

In Ground Two of his petition, Peters asserts that "[t]he unconstitutional denial of a continuance constructively denied Petitioner his Sixth Amendment right to effective assistance of counsel at trial." (Pet. at 9-G.) He points to the two instances in which Attorney Walmer moved for a continuance to give him time to prepare for trial: (1) upon being promoted from "standby counsel" to "co-counsel" during the hearing on January 18, 2000, and (2) the next morning, January 19, 2000, when he confessed that he did not have an opportunity to review all of the voluminous records in the case the night before. (*Id.* at 9-G through 9-H.) Petitioner points out that none of his prior attorneys had prepared his case for trial and that Walmer therefore did not have the benefit of another attorney's preparatory strategic decisions. (*Id.* at 9-I.) Peters contends that we should give him the benefit of a presumption of prejudice pursuant to *United States v. Cronic*, 466 U.S. 648 (1984), "because the trial court's denial of a short continuance placed Walmer in circumstances that made it impossible for him to render competent assistance." (*Id.* at 9-I.) In the alternative, he contends that he is entitled to relief under the *Strickland* standard, as he was prejudiced by Walmer's deficient performance in inadequately cross-examining and impeaching D.B. with available inconsistent statements and materials and in failing to call any defense witnesses except for Peters himself. (*Id.*) (*See also* Pet'r Br. at 15-19.)

Respondents' submissions offer little guidance on how the Court should resolve this claim. They appear to contend that we should not review this claim because it is part of a "mixed petition" presenting both exhausted and unexhausted claims. They do not, however, squarely address the issue of whether or not available state remedies as to this claim have been exhausted. Rather, they assert that, because Petitioner did not raise his first claim in state court, "the claims" — presumably including this second claim — "fail to meet the exhaustion requirement under [*Doctor v. Walters*, 96 F.3d 675 (3d Cir. 1996)]." (Ans. at 9.) Petitioner reads Respondents' answer to concede that this second claim has been properly exhausted, because Respondents seem to contend that his first claim was not raised in state court and because they characterize his habeas petition overall as "mixed." (Pet'r Trav. at 4 ("At paragraph 34 of their answer, respondent expressly conceded that habeas claim two has been exhausted. (Resp. Mom. of Law at p. 9).").) We proceed to explore this issue in greater detail.

**1.      Petitioner's exhaustion of state court remedies as to this claim**

Peters did not raise on direct appeal his claim that the trial court erred in denying counsel's requests for continuances on January 18 and 19, 2000 or that his Sixth Amendment rights to the effective assistance of counsel were violated as a result of the continuance denial. (*See* Appellant's Br. to Pa. Super. Ct., 3/2/01, at 6 (listing Questions Involved); Pa. Super. Ct. Op., 11/27/01, at 2 (quoting same).) (*See also* Appellant's Br. to Pa. Super. Ct., 3/21/05, at 9 (noting in PCRA appeal that "[d]enial of the continuance motions was not raised" on direct appeal).) On PCRA review, the nominal issue on appeal to the Superior Court was whether the PCRA court erred in dismissing the petition without a hearing. (*See* Appellant's Br. to Pa. Super. Ct., 3/21/05, at 4 (listing Question Involved); Pa. Super. Ct. Op., 9/30/05, at 4 (quoting same).) That does not appear on its face to

27

implicate the claim raised as the second ground of this federal petition.

We recognize that one of the claims raised in Peters's underlying *pro se* PCRA petition was that:

> Counsel was ineffective for failing to raise, object, argue and preserve for post-trial or appellate review, the trial court's abuse of discretion in denying repeated defense requests for continuance, thereby, in effect, denied the defendant his constitutional right to the effective assistance of counsel, by denying counsel a continuance to investigate and to prepare a proper defense.

(PCRA Pet., 6/21/02, at p. 3A-14.)  Petitioner's counseled brief to the Superior Court recited the history of Walmer's appointment as counsel, the timing of his requests for continuances, and the consequences of what Peters attributes to Walmer's lack of preparation.  (*See* Appellant's Br. to Pa. Super. Ct., 3/21/05, at 5-8, 21-22.)  Peters argued in that brief that his claim that Walmer's alleged ineffectiveness in failing to preserve and argue on appeal the issue of the denials of his requests for continuances was cognizable on PCRA review and had not been either previously litigated or waived.  (*Id.* at 10, 14-15.)  He contended that an evidentiary hearing was necessary regarding the prejudice Peters sustained due to the trial court's denial of his continuance requests and the explanation for Walmer's failure to raise the continuance issue on direct appeal.  (*Id.* at 10, 15-20, 25-26.)  The Superior Court disagreed with Peters's contention that this issue was not previously litigated.  The court asserted that it had, in fact, reviewed on direct appeal Petitioner's claim "that the trial court erred in refusing to grant a continuance," citing to pages 17-18 of its opinion on direct appeal, and recited its prior statement that Peters had been "disingenuous" in suggesting he wanted to proceed *pro se* but then requesting a continuance for stand-by counsel to be appointed.  (*Id.* at 7.)  The Superior Court concluded that the PCRA court properly dismissed the PCRA petition without

a hearing because the issues raised in the brief had been previously litigated.  (*Id.*)

After reviewing the portions of the Superior Court's decision on direct review to which it cited in its decision involving the PCRA petition, we cannot agree with that court's conclusion that the issue as to the ineffectiveness of Walmer for failing to preserve the continuance denial issue was previously litigated.[22]  However, we conclude that even if that issue were fairly presented to the state court, it did not serve to exhaust available state relief as to the *different* claim Peters brings on federal habeas review.  Before the state court, Peters couched his claim as Walmer's ineffectiveness for failing to preserve as an issue on appeal the trial court's denial of the January continuance requests. In his federal habeas petition, however, Peters seeks relief because the denial of the continuance was allegedly unconstitutional.  (*See* Pet. at 9-G (identifying Ground Two as: "The unconstitutional denial of a continuance constructively denied Petitioner his Sixth Amendment right to effective assistance of counsel at trial.").)  While both claims involve the continuance denials and the allegedly deficient performance that Peters claims resulted from them, Peters did not fairly present in state court the claim he raises here.  As a court in this district recently recognized, "[p]resenting a claim for ineffective assistance of trial counsel for failure to raise a constitutional claim is not the same as raising the underlying claim itself and will not serve to exhaust the underlying claim for purposes of federal habeas review." *Russi v. Rozum*, No. 06-2730, 2007 WL 1876533 (E.D. Pa. June

---

[22] On direct appeal, the issue before the court was whether the time period from the September 1999 trial term until the November 1999 trial term was properly excluded for Rule 600 (speedy trial) calculation purposes.  The Superior Court concluded that that time was properly excluded, given in part what it interpreted as mixed signals from Peters in the fall of 1999 and at the January 18, 2000 pre-trial hearing as to whether or not he sought to have new, regular counsel appointed.  Resolving the Rule 600 issue, however, did not require the court to fully evaluate either the propriety of Walmer's requests for continuances on January 18 and 19, 2000 or the trial court's denial of those requests.

27, 2007) (Baylson, J.).  *See also Gattis v. Snyder*, 278 F.3d 222, 238 n.6 (3d Cir. 2002) (rejecting

notion that claim for ineffective assistance of trial counsel was sufficient presentation of a separate

legal claim as it "involves a completely different legal theory"); *Dooley v. Petsock*, 816 F.2d 885,

889 n.3 (3d Cir. 1987) (observing that any due process claim brought in federal petition would be

unexhausted if petitioner had raised only an ineffective assistance of counsel claim in state court);

*Keeling v. Shannon*, No. 06-4626, 2003 WL 22158814, *9 (E.D. Pa. Aug. 20, 2003) (noting that

presentation of ineffective assistance of counsel claim "is not the same as [presenting] the underlying

substantive claim") (Green, J., adopting Report of Rueter, M.J.).

Therefore, we are constrained to conclude that Peters did not exhaust available state court

remedies as to his claim that an unconstitutional denial of a continuance constructively denied him

his Sixth Amendment right to the effective assistance of counsel at trial.  As further litigation of this

claim is not available to him in the state court due to the PCRA limitations period, the claim may

be considered procedurally defaulted.

## 2.    Basis to excuse procedural default: cause and prejudice[23]

Peters appears to contend that, as to any default of either of the two claims raised in his

federal habeas petition, he has established cause "in the PCRA court's frustration of his efforts to

utilize the state collateral process to redress the constitutional deprivations set forth in his PCRA

petition. . . .  The PCRA judge's blatant arbitrariness in his cavalier treatment of petitioner's effort

to develop his PCRA claims in accordance with the Rules Governing PCRA cases created such a

---

[23] We address only the cause and prejudice standard as to the default of Ground Two of the petition, as our discussion *supra* explains why the fundamental miscarriage of justice exception does not provide a basis to excuse any procedural default in this case.

'procedural morass' that it declineated [sic] the Post-Conviction process to nothing more than a 'hollow exercise.'" (Pet'r Trav. at 19.)  Again, while we are sympathetic to the fact that the PCRA court perhaps misapprehended how the claims raised in his PCRA petition differed from those raised on direct appeal, that does not excuse the failure of Peters to have raised either on direct or on PCRA review the issue he raises here: the alleged unconstitutionality of the court's denials of counsel's continuance requests.  He has not identified any "external impediment preventing counsel [Walmer] from constructing or raising the claim" to the Superior Court.

We note that attorney error rising to the level of a Sixth Amendment violation under *Strickland v. Washington*, 466 U.S. 668 (1994), may establish "cause" for failure to have exhausted a federal habeas claim.  Such ineffectiveness first must have been properly presented to the state courts as an independent claim.  *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000).  Here, Peters did properly present this issue of Walmer's alleged ineffectiveness to the state court by raising it in his PCRA petition and, in our opinion, sufficiently presenting the issue as part of his appeal to the Superior Court of the PCRA court's dismissal.  However, when we consider the support for this assertion provided in Peters's PCRA papers, we are not persuaded that the failure by Walmer to have pursued the continuance denial issue on direct appeal could be characterized as a violation of the Sixth Amendment as defined by *Strickland*.

The *Strickland* standard presumes that a defendant received an unfair trial if: (1) counsel's "representation fell below an objective standard of reasonableness," 466 U.S. at 688; and (2) that "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.  Peters devotes more than 14 pages of his PCRA

31

petition to the claim that Walmer "was ineffective for failing to raise, object, argue and preserve for post-trial or appellate review" the trial court's improper denial of the continuance request.  (PCRA Pet., 6/21/02, at 3 A-14 through 3 A-28.)  His argument largely focused on the injustice of the continuance denial.  His Sixth Amendment theory, however, was that: the issue of the denial of the continuance request was a meritorious issue for appeal; the Sixth Amendment encompasses the right to the effective assistance of counsel on direct appeal; and he was prejudiced by Walmer's failure to raise this issue on appeal.  In his counseled brief to the Superior Court on this issue, Peters put it more succinctly:

> Clearly, the continuance issue had arguable merit on direct appeal.  Whether Mr. Walmer had a reasonable tactical basis for not including it in the appeal can only be known after a PCRA hearing. As for prejudice, again, only a hearing can tell us what was left out of the cross (and what the uncalled witnesses would have said), which may have altered the ultimate outcome of the trial.

(Br. of Appellant to Pa. Super. Ct., 3/21/05, at 25-26.)  While we appreciate that the record before us is devoid of evidence as to any acceptable reason this issue was not pursued on appeal, we believe the record is sufficient without an evidentiary hearing to satisfy us that whatever was left out of the cross-examination of D.B. and whatever the uncalled witnesses would have said would not have altered the ultimate outcome of the trial.  Our discussion in note 21, *supra*, canvassed the territory of what 10 witnesses might have said had they been called, although even that discussion was based largely on Petitioner's report of the content of their proffered testimony and rarely in the form of an affidavit or reliable witness statement.  Moreover, Peters has not provided evidence from those witnesses that they would have been available to testify at trial or that they were or could have been known to Walmer had his continuance request been granted.  With respect to what additional cross-

examination of D.B. might have yielded, we do not believe that testimony from Walmer — speculating about what he might have done differently had he had more time to prepare — is necessary for our resolution of this issue.  Peters's submissions to this Court are replete with examples of what he believes demonstrates D.B.'s poor credibility and improper motivations.  These themes, however, were fully and quite competently developed by Walmer at trial, from his opening statement to his extensive cross-examination of D.B. to his closing argument.  We do not believe that an evidentiary hearing would enable Peters to demonstrate that "the result of the proceeding would have been different," *Strickland*, 446 U.S. at 694, had Walmer had more time to prepare for trial.

We conclude that, notwithstanding Peters's assertion that the failure to have pursued continuance denial issue on direct appeal is attributable to ineffective assistance by Walmer, he has not demonstrated "cause" for his failure to have exhausted available state court relief as to this claim upon which he now seeks federal habeas relief.  Therefore, he has not satisfied the cause and prejudice exception to the procedural default doctrine.  As we earlier concluded that he cannot "pass through the gateway" for a review of the merits of any claim on the grounds of actual innocence, we will not excuse the procedural default of his second claim and consider its merits.

### C.     Claims Raised in Amendments

Peters sought to amend his petition to add four additional grounds for relief.   In opposing Petitioner's request to amend his petition, Respondents contended that the addition of these claims "would result in undue prejudice to Respondent" given that he did not provide the Court with a "compelling reason for the amendment" or an "explanation as to why his proposed amendments were not made a part of the original petition."  (Resp. to Mot. to Am. at ¶ 37.)  In the alternative, they contended that Peters did not exhaust his state court remedies as to any of these claims.  (*Id.* at ¶ 39.)

33

For the reasons outlined in our Order of July 11, 2007, we concluded that the petition should be amended. That Order did not, however, purport to address the merits of the claims raised in the amendment or to reflect that there might not be other procedural hurdles to our granting relief on those bases. Because we find that relief is precluded in all four of the claims raised in the amendments due to the same defect, we first discuss the applicable legal principle and then apply it to each of the additional claims.

### 1.      Timeliness of amendments

Peters's federal habeas petition is governed by the limitations period that Congress enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The statute provides that a one-year period of limitation begins to run on the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review and is tolled for the period of time "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. §§ 2244(d)(1)(A), 2244(d)(2).[24] The deadline for Peters to bring any claims for federal habeas relief expired on or about September 26, 2006.[25] Peters initiated this action on July 22, 2006, which renders the claims outlined in the original petition timely. The same is not automatically assumed,

---

[24] The record before us does not suggest that Peters is entitled to an alternative limitations period start date under Section 2244(d)(1)(B), (C), or (D).

[25] Petitioner's conviction became final on December 27, 2001, upon the expiration of the 30-day period to seek allocator in the Pennsylvania Supreme Court. His PCRA action was considered properly filed by the state courts and was pending from June 21, 2002 until March 21, 2006. Therefore, a total of 176 days of the limitations period passed between the time his conviction became final and he initiated his PCRA action. The limitations period resumed running on March 21, 2006 and expired on or about September 26, 2006. The pendency of a habeas petition does not toll the habeas period of limitations. *See Duncan v. Walker*, 533 U.S. 167 (2001).

34

however, of the claims raised in the amendments submitted on November 20, 2006.

Rule 15 of the Federal Rules of Civil Procedure permits "[a]n amendment of a pleading [to] relate[] back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2).  The Supreme Court has specifically held, however, that "[a]n amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005).  Therefore, to the extent that Petitioner's amended claims concern matters that do not share a common "core of operative facts" with the claims that were timely raised in his original petition, those claims are not be timely and cannot provide a basis for habeas relief. *See Mayle*, 545 U.S. at 659. *See also United States v. Duffus*, 174 F.3d 333, 338 (3d Cir. 1999) ("A prisoner should not be able to assert a claim otherwise barred by the statute of limitations merely because he asserted a separate claim within the limitations period.").[26]  Stated a different way, "[u]nder Fed. R. Civ. P. 15(c), an amendment which, by way of additional facts, clarifies or amplifies a claim or theory in the petition may, in the District Court's discretion, relate back to the date of that petition if and only if the petition was timely filed *and the proposed amendment does not seek to add a new claim or to insert a new theory into the case*." *United States v. Thomas*, 221 F.3d 430, 432 (3d Cir. 2000) (emphasis added). *See also id.* at 436 (explaining that "*Duffus* teaches that ... a party cannot amend a § 2255 petition to add a

---

[26] Respondents cited the *Duffus* case in their answer to Petitioner's motion for leave to amend, albeit for a different proposition.

completely new claim after the statute of limitations has expired").[27]

We proceed to consider the timeliness of each of the four amended claims under these relation back standards.

### a.    Ground Three

The first additional claim Peters raises (which he denominates as "Ground Three") is that he was denied his Seventh Amendment right to confront his accuser at trial because the trial judge threatened to place time limitations on Walmer's cross-examination of D.B., which resulted in Walmer not exploring "hundreds of conflicting statements, fabricated diary, and prior contradictory testimony."   (Am. Pet. at 9-K, 9-M, 9-N.)

The operative facts involved in the first claim that Peters raised in his original, timely-filed petition concerned the circumstances that led to his request to proceed *pro se* and his subsequent request that new counsel be appointed to represent him.   The operative facts involved in the second claim that Peters raised in his original petition involved these circumstances and also concerned the challenges that Attorney Walmer faced by virtue of the timing of his appointments as standby

---

[27] Although the *Thomas* and *Duffus* cases involved habeas corpus petitions filed pursuant to 28 U.S.C. § 2255 as opposed to § 2254, we see no reason to distinguish between the two types of habeas petitions for these purposes.  The *Mayle* case decided by the United States Supreme Court involved a § 2254 petition.

We also note that the instructions including in this Court's standard form for use in Section 2254 habeas applications advises prospective petitioners:

> Your habeas corpus petition must be filed within the 1-year statute of limitations time limit set forth in 28 U.S.C. §2244(d)(1).  (There are limited circumstances in which the petition may be amended, within the one-year time period, to add additional claims or facts, see Federal Rules of Civil Procedure 15; or amended after the one-year period expires, in order to clarify or amplify claims which were timely presented, see United States v. Thomas, 221 F. 3d 430 (3d Cir.2000.)

(Pet. at 1-2.)

counsel and then co-counsel given the trial date and the preparation required for trial.  Those two

claims implicated his rights under the Sixth Amendment "to have the Assistance of Counsel for his

defence."  While Peters recites much of this same factual history by way of introduction of the claim

he seeks to bring as his third ground for relief (*see* Am. Pet. at 9-K through 9-M), the operative facts

of that claim are the trial judge's comments to Attorney Walmer that he should prepare to complete

his cross-examination of D.B. so as to conclude by the end of that trial day, which Peters construes

as a limitation upon his right to confront his accuser at trial.[28]

        We recognize that, in Petitioner's view, Walmer would have been in a position to conduct

his cross-examination more efficiently — and thus perhaps avoid irritating the trial judge to the point

that he threatened to cut off cross-examination — had Peters been represented by counsel earlier (and

represented by counsel preparing meaningfully for trial) and/or had he been granted the continuance

requested.  However, we cannot say that what we are faced with involves a sufficient common core

of material facts with the claims raised in the original petition.  The operative facts of Ground Three

are the denial of the continuance request (which presumably would have allowed Walmer to prepare

a more efficient and succinct cross-examination) and the admonitions to Walmer that the court

would "pretty soon" start putting limitations on his cross-examination and that he should aim to

complete his cross-examination that afternoon.  While there is some overlap in the facts giving rise

to these claims, the legal theory of Ground Three is entirely separate from that of either of the

original grounds in the petition.  While Ground Three also arises under the Sixth Amendment, it is

---

[28] Peters refers to this claim as implicating his "Seventh Amendment right to confront his accuser at trial."  (*See* Am. Pet. at 9-K.)  The Seventh Amendment addresses the right to a jury trial in civil cases and does not appear applicable in this matter.  We suspect that Peters intended to refer to the Confrontation Clause of the Sixth Amendment.

based on the Confrontation Clause.  This is a clearly distinct theoretical concept from the First and Second Grounds.  To permit the Third Ground to relate back to the First or Second Ground, we would be permitting Peters "to add a new claim or to insert a new theory into the case" — which would undermine the AEDPA limitations period.  *See Thomas*, 221 F.3d at 431 ("[A]n amendment which, by way of additional facts, clarifies or amplifies a claim or theory in the petition may ... relate back ... if and only if the petition was timely filed and the proposed amendment does not seek to add a new claim or to insert a new theory into the case.").  We conclude that consideration of Ground Three is barred by the statute of limitations.

### b.    Ground Four

The second additional claim Peters raises in his amendment, denominated Ground Four, is that he was subjected to a "[w]rongful convi[c]tion, in violation of Petitioner's Constitutional right to due process of law."  (Am. Pet. at 9-O.)  His amendment identifies four particular counts of particular criminal informations for which he contends he was convicted "without a single word of testimony presented to indicate that any of the [identified] assaults had even occurred," (*id.*), citing to portions of the testimony in which D.B. allegedly contradicted the allegations contained in the informations and citing to the transcript of the sentencing proceeding at which he was sentenced for these convictions.  (*Id.* at 9-O through 9-P.)

We conclude that this claim, brought outside the limitations period, does not relate back to the timely-filed claims.  The amendment does not merely clarify or contribute additional facts to the timely-filed claims.  Rather, this amendment concerns the sufficiency of the evidence to support the conviction on certain charges and implicates the Due Process Clause of the Fourteenth Amendment. The timely-filed claims, by contrast, involve Petitioner's right to the effective assistance of counsel

38

under the Sixth Amendment and the trial court's refusal to grant certain requested continuances.  The proposed claim does not share a common "core of operative facts" with the claims that were timely raised in the original petition.  *Mayle*, 545 U.S. at 659.  We conclude that the claim raised in Ground Four is time-barred.

### c.   Ground Five

The third additional claim Peters brings is one for "[p]rosecutorial misconduct, in violation of Petitioner's constitutional right to due process of law."  (Am. Pet. at 9-P.)  Peters contends that, at trial, "[t]he Prosecution knowingly allowed the alleged victim, [D.B.], to testify to numerous assaults the Petitioner was never charged with," which testimony he purports to identify in the trial transcript.  (*Id.* at 9-P through 9-Q.)

We have no trouble concluding that this claim does not relate back to the timely-filed claims.  The proposed amendment does not clarify or add additional facts to the timely-filed claims that were brought under the Sixth Amendment or asserting trial court error.  On the contrary, this proposed amendment concerns the presumably prejudicial effect of testimony of D.B. as to multiple encounters at particular locations for which the charging documents identify only one encounter — which prejudice Peters lays at the feet of the prosecutor.  The proposed claim shares no common "core of operative facts" with the claims that were timely raised in the original petition.  We cannot consider this entirely new claim brought outside the limitations period.

### d.   Ground Six

The final additional claim that Peters brings is also described as involving "[p]rosecutorial misconduct, in violation of petitioner's constitutional right to due process of law," but concerns his allegation that, at trial, "the prosecution knowingly permitted the alleged victim to falsely testify

under oath, time after time in order to obtain a conviction." (Am. Pet. at 9-R.) He identifies various instances in the trial in which he contends D.B. testified inconsistently and falsely and "the prosecution permitted that perjured testimony without objection" or "remained silent." (*Id.* at 9-R through 9-W. *See also generally id.* at 9-R through 9-Z-14.)

We again have no trouble concluding that this claim does not relate back to the timely-filed claims. The amendment does not clarify or add additional facts to the timely-filed claims that were brought under the Sixth Amendment or involving trial court error. On the contrary, this amendment concerns the prosecutor's role in the alleged admission of or elicitation of false evidence. The new claim shares no common "core of operative facts" with the claims that were timely raised in the original petition. This claim is time-barred.

## IV.    CONCLUSION

Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district court judge is required to make a determination as to whether a certificate of appealability ("COA") should issue. A COA should not issue unless the petitioner demonstrates that jurists of reason would find it to be debatable whether the petition states a valid claim for the denial of a constitutional right. Where the district court has denied a claim on procedural grounds, a COA is not appropriate unless it also appears that jurists of reason would find the correctness of the procedural ruling to be debatable. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, for the reasons set forth above and in light of the clear authorities invoking the exhaustion requirement as a procedural bar, we do not believe a reasonable jurist would find the Court to have erred in denying the present petition. Accordingly, we do not believe a COA should

issue.

Our Recommendation follows.

## R E C O M M E N D A T I O N

**AND NOW**, this   13th        day of July, 2007, it is respectfully **RECOMMENDED** that

the petition for a writ of habeas corpus (Doc. No. 1) be **DENIED**.   It is **FURTHER**

**RECOMMENDED** that a certificate of appealability should **NOT ISSUE**, as we do not believe that

Petitioner has made a substantial showing of the denial of a constitutional right or that reasonable

jurists would find the correctness of the procedural aspects of this Recommendation debatable.

BY THE COURT:


 /s/ David R. Strawbridge_____
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

41